Philip D. Stern
Andrew T. Thomasson
STERN THOMASSON LLP
150 Morris Avenue, 2nd Floor
Springfield, New Jersey 07081

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WANDA MARDIS, KIM ALEXANDER, CECILIA MORRIS, KARLA DOZIER, SHEILA BAKER, KATRINA CORBITT, and LENEL NICHOLS, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JACKSON HEWITT TAX SERVICE INC., JACKSON HEWITT, INC., TAX SERVICES OF AMERICA, INC., and UNKNOWN FRANCHISEES 1-100, <br><br> Defendants. | **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

Plaintiffs, Wanda Mardis, Kim Alexander, Cecilia Morris, Karla Dozier, Sheila Baker, Katrina Corbitt, and Lenel Nichols (collectively "Named Plaintiffs"), individually and on behalf of all others similarly situated (collectively "Plaintiffs"), by way of this Class Action Complaint against Jackson Hewitt Tax Service Inc., ("JHTSI"), Jackson Hewitt, Inc., ("Jackson Hewitt"), Tax Services of America, Inc., ("TSA"), and Unknown Franchisees 1-100 ("Franchisees") (collectively referred to as "Defendants") aver as follows:

1

**THE PARTIES**

1.      Plaintiff Wanda Mardis is a citizen and resident of Jefferson County, Kentucky, who was previously employed by Defendants as a tax preparer.

2.      Plaintiff Kim Alexander is a citizen and resident of Jefferson County, Kentucky, who was previously employed by Defendants as a tax preparer.

3.      Plaintiff Cecilia Morris is a citizen and resident of Jefferson County, Kentucky, who is currently employed by Defendants as a tax preparer.

4.      Plaintiff Karla Dozier is a citizen and resident of Jefferson County, Kentucky, who was previously employed by Defendants as a tax preparer.

5.      Plaintiff Sheila Baker is a citizen and resident of Jefferson County, Kentucky, who was previously employed by Defendants as a tax preparer.

6.      Plaintiff Katrina Corbitt is a citizen and resident of Cook County, Illinois, who was previously employed by Defendants as a tax preparer.

7.      Plaintiff Lenel Nichols is a citizen and resident of  Putnam County, Tennessee, who was previously employed by Defendants as a tax preparer.

8.      Defendant, Jackson Hewitt Tax Service Inc., is a for-profit corporation organized under the laws of Delaware, with its principal place of business listed as 3 Sylvan Way, Parsippany, New Jersey 07054-0657, and doing business in all 50 states. It is also the parent corporation of Defendants Jackson Hewitt Inc., and Tax Services of America, Inc.

9.       Defendant, Jackson Hewitt Inc., is a for-profit corporation organized under the laws of Delaware, with its principal place of business listed as 3 Sylvan Way, Parsippany, New Jersey 07054-0657, and doing business in all 50 states. It is also a subsidiary corporation of Defendant Jackson Hewitt Tax Service Inc.

10.     Defendant, Tax Services of America Inc., is a for-profit corporation organized

2

under the laws of Delaware, with its principal place of business listed as 3 Sylvan Way, Parsippany, New Jersey 07054-0657, and doing business in at least 28 states.  It is also a subsidiary corporation of Defendant Jackson Hewitt Tax Service Inc.

11.     Defendant, Unknown Franchisees 1-100, are for-profit corporations organized under the laws of the various 50 states.  These corporations are currently unknown to Plaintiffs, who therefore sue these Defendants by fictitious names.  Plaintiffs reserve the right to amend this Complaint and include the Unknown Franchisees' true names if and when they become known.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction in this case pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), becuase the amount in controversy exceeds $5,000,000 exclusive of costs and interest,  at least one Class Member is a citizen of a different state from either of Defendants, and there are more than 100 Class Members.

13.     This Court has personal jurisdiction over the Defendants as their principle place of business is in New Jersey.

14.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants' headquarters are in New Jersey and, therefore, they reside in this judicial district.

## NATURE OF THE SUIT

15.     Every year, hundreds of millions of Americans must file their income taxes with the federal government and the government of their respective states. Tax preparation service companies like Jackson Hewitt are an attractive income tax return filing option for many Americans because it abrogates the burden of personally taking on the task of filing returns. The very foundation of Jackson Hewitt Tax Service Inc., and its subsidiaries and franchisees, are the thousands of tax preparers they employ.

16.     JHTSI and/or Jackson Hewitt operates through a tightly controlled system of franchisees.  The largest franchisee is TSA, a wholly owned subsidiary of JHTSI and/or Jackson Hewitt. TSA directly operates roughly 20% of locations claiming the name "Jackson Hewitt."  The rest of the locations are run by other franchisees, whose day to day operations also are closely supervised and controlled by JHTSI and/or Jackson Hewitt.

17.     Plaintiffs are current or former tax-preparers employed by Defendants.

18.     Named Plaintiffs employed as tax-preparers by TSA bring this action individually and on behalf of a National TSA Class alleging breach of contract and breach of implied contract under common law for Defendants' failure to pay their employees their contracted for pay for the 2013-2014 tax season. Named Plaintiffs employed as tax-preparers by TSA also bring this action alleging unjust enrichment by JHTSI and Jackson Hewitt.

19.     This action is also brought by all Named Plaintiffs who are current or former Franchisee tax-preparers on behalf of a National Franchisee Class alleging breach of contract and breach of implied contract against the Unknown Franchisees and unjust enrichment against JHTSI and Jackson Hewitt for Defendants' failure to pay their employees their contracted for pay for the 2013-2014, 2014-2015, and 2015-2016 tax seasons, and JHTSI and Jackson Hewitt's retention of the benefit.

20.     Plaintiffs also bring various subclasses for violations of specific state wage and hour laws for the 2013-2014, 2014-2015, and 2015-2016 tax seasons.

21.     Pursuant to Plaintiffs' employment as tax preparers, Plaintiffs were promised sales commissions  as part of their compensation packages.

22.     The sales commissions set forth in these commission plans were calculated as a percentage of the net revenues that the tax-preparer generated for Defendants.  For example, in

one of these commission plans (the TSA Plan, hereafter "Commission Plan"), net revenues were defined as follows:

- Five percent (5%) of the fees charged separately and received by the Company, less applicable premium fees for sale of TSA's Gold Guarantee program. If the Gold Guarantee fee is inclusive in the base price of the tax return, the preparer will not receive an additional compensation beyond their stated percentage of tax preparation volume; and

- 59% of your Net Revenues. For the purposes of this Plan, the term "Your Net Revenues" shall mean the total net amount of tax preparation fees received by TSA for all individual income tax returns prepared by you through TSA's tax preparation and processing systems during the 2014 Tax Season. By way of example only and without limitation, Your Net Revenues shall be net of (and reduced to reflect) (i) any applicable sales, use or similar taxes, (ii) any unfunded financial product payments; and (iv) any tax preparation fees charged to customers in connection with the preparation and processing of fraudulent individual income tax returns.

Exhibit 1, 2014 Tax Preparer Commission Plan.

23.     Plaintiffs signed, or were provided, a copy of the commission plan at the start of each tax season and/or at the time of hiring, or worked without having a copy physically provided to them.

24.     Beginning in the 2013-2014 tax season, Defendants ran a prepaid gift card promotion (hereinafter the "Gift Card Promotion"), whereby Defendants would give a $50-$100 prepaid gift card to customers who filed their taxes with Defendants. Defendants required Plaintiffs to hand out these gift cards.  Millions of prepaid gift cards were handed out to customers pursuant to the Gift Card Promotion during the applicable class periods.

25.     At the end of the 2013-2014 tax season, Plaintiffs were supposed to be paid their sales commissions in accordance with the commission plan. However, the commissions Plaintiffs received were substantially lower than the amount to which they were entitled because in calculating the commissions owed to a given class member, Defendants improperly deducted the value of the prepaid gift cards that a class member had delivered to customers under the Gift Card Promotion from the *gross* revenues the class member had earned for the Defendants.

5

26.     The next year, 2014-2015 tax season, Defendants revised the commission plan for at least the TSA tax preparers (the "Revised Comission Plan"). The Revised Commission Plan's language was changed to read as follows:

- The following commission structure will be paid in accordance with the above referenced offer of employment. Commissions are paid on net received revenue, determined as fees charged separately and received by the Company, less applicable premium fees for sale of TSA's Gold Guarantee program and any promotional programs, such as the $50 Gift Card program. If the Gold Guarantee fee is inclusive in the base price of the tax return, the preparer will not receive an additional compensation beyond their stated percentage of tax preparation. This commission structure applies to the total net amount of tax preparation fees received by TSA for all individual income tax returns prepared by you through TSA's tax preparation and processing systems during the 2015 Tax Season.
- Additionally, your Net Revenues shall be net of (and reduced to reflect) (i) any applicable sales, use or similar taxes, (ii) any unfunded financial product payments; and (iv) any tax preparation fees charged to customers in connection with the preparation and processing of fraudulent individual income tax returns.

27.     Notably, TSA added "promotional programs, such as the $50 Gift Card program" to the section indicating how commissions were calculated:

> [c]ommissions are paid on net received revenue, determined as fees charged separately and received by the Company, less applicable premium fees for sale of TSA's Gold Guarantee program and any promotional programs, ***such as the $50 Gift Card program.***

Exhibit 2, 2015 Tax Preparer Commission Plan (***Emphasis added***.)

28.     At the end of the 2014-2015 tax season, Plaintiffs commissions were again reduced by the cost of the Gift Card Promotion.

29.     Defendants ran the Gift Card Promotion again during the 2015-2016 tax season and will presumably deduct the costs of this promotion, once again, from the gross revenues the class member had earned for the Defendants,  thereby lowering Plaintiffs' commission payments.

30.     As a result, TSA and Franchisees have breached their contracts with Plaintiffs, JHTSI and Jackson Hewitt have been unjustly enriched, and Defendants have violated the wage and hour laws of certain states.

## FACTUAL ALLEGATIONS

### A.  Corporate Background and Business Model

31.     Wholly owned by JHTSI, Jackson Hewitt is the second largest full-service tax preparation company in the United States, with franchised and company-owned office locations throughout the country.  Through a network of over 6,300 locations nationwide, including nearly 3,000 Walmart kiosk locations, Jackson Hewitt files tax returns for, and offers related high interest loans and services to both individual and corporate customers.

32.     Jackson Hewitt, through TSA and Franchisees both doing business as Jackson Hewitt, caters to primarily those individuals categorized in low to lower middle socio-economic class, and who seek to file simple 1040A and 1040EZ tax returns, as the vast majority of these individuals qualify for a quick tax refund.  Upon information and belief, Jackson Hewitt is responsible for filing roughly 2.5 million computerized federal, state, and local individual income-tax returns each year.

33.     When its customers avail themselves of Jackson Hewitt's tax preparation services, Jackson Hewitt offers to file their income tax returns for "free," with the understanding and agreement that Jackson Hewitt will take a fee from any refunds issued. Jackson Hewitt's fees for this "free" service are significant; it is not unusual for Jackson Hewitt's fees to reach over $400 for a single filer.

### B.  Jackson Hewitt's Relationship with TSA and its Franchisees

34.     Jackson Hewitt's tax service business is based on its "Operating System" that incorporates a system for preparing, checking and electronically filing income tax returns using certain software, accounting methods, merchandizing, equipment selection, advertising, promotional techniques, personnel training, and quality standards that feature Jackson Hewitt proprietary marks and materials.

35.     At all times relevant hereto, JHTSI and/or Jackson Hewitt have exercised significant control over both TSA and Franchisees' day-to-day operations and, specifically, have exercised a considerable degree of control over both TSA and Franchisees' tax preparation services and tax preparer training.

36.     JHTSI and/or Jackson Hewitt facilitates its control over TSA and the Franchisees, in part, through its intranet system, "JHnet." JHnet is a web-based system that allows quick communication between Defendatns as well as provides access to other loactions' corporate databases, and a myriad of other information. Through JHnet, Jackson Hewitt disseminated information to TSA and Franchisees regarding its policies and procedures, and further, required Plaintiffs to submit through JHnet all client tax returns for review and filing with the Internal Revenue Service ("IRS").

37.     Before beginning employment with TSA and Franchisees, Jackson Hewitt requires newly hired tax preparers, including Plaintiffs, to take a tax preparation course which utilizes instructional materials that were prepared by Jackson Hewitt and made available through JHnet.

38.     Plaintiffs were also required to complete several Jackson Hewitt-prepared training "modules" and to take a "Tax Preparer Readiness Test" on JHnet before they began employment. Completion of the training and testing was mandatory of all tax preparers and all training materials were stamped with the Jackson Hewitt name and logo.

39.     In addition, Jackson Hewitt provided all tax preparers employed by TSA and Franchisees, including Plaintiffs, with a written code of conduct ("Jackson Hewitt Code of Conduct") outlining the basic requirements of professional and ethical conduct for all employees involved in the preparation of tax returns at Jackson Hewitt locations.

40.     The Jackson Hewitt Code of Conduct makes no reference to TSA or Franchisees

and refers to the reader as an employee of Jackson Hewitt.

41.     Franchisees were required to provide Jackson Hewitt their employee payroll information through JHnet or, at minimum, set up the payroll system electronically such that Jackson Hewitt could access the information remotely on demand.

42.     A sister Third Circuit court has noted in *Myers v. Garfield & Johnson Enters.*, 679 F. Supp. 2d 598 (E.D. Pa. 2010) further examples of the extensive control exerted by Jackson Hewitt over franchisees and their employees:

    a.  Jackson Hewitt publishes and periodically updates a compliance manual setting forth "mandatory standards, specifications and requirements of the franchised system";

    b.  Specifying the hours at which franchise locations are to be open;

    c.  Jackson Hewitt requires franchisees to compensate customers for franchisee mistakes, as determined by Jackson Hewitt;

    d.  The Jackson Hewitt manual "also prescribes various office and training procedures to ensure quality and prevent tax fraud. For example, the manual sets mandatory retention periods for all office paperwork, establishes workplace procedures to protect confidentiality, and requires compliance training for all tax preparers at the franchise";

    e.  Jackson Hewitt requires that franchisee employees complete training programs designed by Jackson Hewitt and monitors this training;

    f.  There are circumstances under which a franchisee is immediately required to terminate an employee;

    g.   Furthermore, "[t]he franchise agreement is terminable if any employee or manager

9

fails to complete the required Jackson Hewitt training, if the franchisee commits any act within or without the Franchised Business that would tend, in [Jackson Hewitt's] opinion, to reflect poorly on the goodwill of [Jackson Hewitt's] name or marks, or violates any law or regulation pertaining to the franchised business." *Id.* at 603 (internal quotations omitted).

**C. The Role of the Tax-Preparer at TSA and Franchisee Locations**

43.     At the start of each tax season, Defendants employ a team of tax preparers to draft and file its clients' income tax returns.  Those tax preparers' term of employment runs solely for the length of the year's said tax season.

44.     Tax preparers like Plaintiffs are presented with commission-based compensation plans before the tax season begins, which promise the tax preparers a commission based upon the revenues that preparer generates.

45.     For example, all tax preparers working in TSA offices across the country during any given tax season receive an identical or nearly identical offer letter from TSA laying out the terms of their base compensation (previously discussed and attached hereto as Exhibit 1).

46.     Plaintiffs were employed at both TSA offices and individual franchisee offices across the United States.

**D. Jackson Hewitt's Gift Card Promotion Program**

47.     Following its bankruptcy in 2011, Defendant continued to develop new promotions directed at lower income customers, with the intent of generating new business and new revenue.

48.     Among the promotions targeted at low income customers was the Gift Card Promotion, which Jackson Hewitt first launched in the months leading up to (and throughout) the 2013-2014 tax season.  The Gift Card Promotion incentivized potential customers to engage Defendants' tax preparation services by providing customers with a $50-$100 Visa or Wal-Mart

gift card if the potential customer ultimately chose to file her or his income taxes with Jackson Hewitt and qualified for the Gift Card Promotion.   See http://offers.jacksonhewitt.com/tax-preparation/special-offers/visa-gift-card-50.

49.     As part of the Gift Card Promotion, and as explained further herein, tax preparers working for Defendants, including Plaintiffs, whether at a TSA location or an individually owned franchise, were required to offer the $50-$100 prepaid cards to all individuals who came into the office, qualified, and agreed to allow Jackson Hewitt to file their income tax return in exchange for a cut of any refund.

50.     The Gift Card Promotion brought in a multitude of first-time clients and generated millions in revenue.

51.     Due to its success, the Gift Card Promotion has been utiltized in every tax season since its inception, including the most recent tax season ending on April 18, 2016.

52.     One of the goals of the Gift Card Promotion is to increase the gross profits of TSA and Franchisee locations, thereby increasing the profits provided to JHTSI and/or Jackson Hewitt as Jackson Hewitt's franchise agreements provide, among other things, a 15% royalty fee that must be paid to it out of a franchisee's "gross volume of business" according to a "royalty payment schedule" outlined in the franchise agreement.  Exhibit 3, Franchisee Agreement at 6.

53.     The Gift Card Promotion has been successful in increasing these royalty fees for JHTSI and/or Jackson Hewitt. Thus, JHTSI and/or Jackson Hewitt reaped the benefits of this growth in business and revenues.

54.     Defendants employed thousands of tax preparers during the 2013-2014 tax season, each of whom was required to facilitate Jackson Hewitt's Gift Card Promotion.  As tax preparers, Plaintiffs were required to provide customers with a $50-$100 prepaid gift card, per Defendants'

11

franchise agreements and manual. At no time did tax preparers have discretion over whether to provide a gift card to the customer.

55.     Plaintiffs, at franchisees' and TSA's behest and direction, handed out hundreds of thousands of these prepaid gift cards to Jackson Hewitt customers.

56.     At the end of the 2013-2014 tax season, Plaintiffs sales exceeded their aggregate wage, thereby qualifying them to earn additional commission-based compensation through their commission plans.

57.     The commissions Plaintiffs received were significantly lower than the amount they had actually earned. This was because in calculating the commissions owed to a given class member, Defendants deducted the value of the prepaid gift cards that Plaintiffs delivered to customers under the Gift Card Promotion from the *gross* revenues the class member had earned for Defendants prior to calculating Plaintiffs' commission percentage.

58.     Nowhere in their 2013-2014 offer letters nor in the accompanying commission plan was such a deduction disclosed, and Plaintiffs did not agree to assume this cost-shifted burden.

59.     In the following year, all TSA-hired tax preparers for the 2014-2015 tax season received offer letters that defined their base compensation and promised additional compensation as sales commissions pursuant to a Revised Commission Plan that had one striking difference, which defined commissions (in applicable part) as net revenue received less "any promotional programs, *such as the $50 Gift Card program*" (previously identified herein as Exhibit 2).

60.     Franchisee tax preparers were not advised of this change in their commission plan.

61.     Once again, Plaintiffs employed during the 2014-2015 tax season were required to give all customers who qualified for the Gift Card Promotion a $50-$100 prepaid gift card, and, although they were purportedly now obliged to pay for said gift cards, tax preparers during the

2014-2015 tax season still had no discretion over whether or not to provide them.

62.     Plaintiffs, at franchisees' and TSA's  behest and direction, handed out hundreds of thousands more prepaid gift cards to Defendants' customers.

63.     At the end of the 2014-2015 tax season Plaintiffs' sales exceeded their aggregate wage, thereby earning them additional compensation as sales commissions.

64.     When they received their commission checks for the 2014-2015 tax year, Plaintiffs' nationwide again received only partial compensation, less than their rightfully earned commissions, by the amounts of the improper and illegal deductions for the costs of the Gift Card Promotion.

65.     However, only TSA tax preparers have had their agreements changed to attempt to skirt the deduction issue.  For example, Ms. Nichols, whose commission structure is used at all Wal-Mart kiosks in the "Southern District," has received the same written commission plan every year.  Exhibit 4, Southern District Wal-Mart Commisson Plan

66.     The Gift Card Promotion continues to be run by Defendants and the cost of the Gift Card Promotion continues to be foisted improperly onto the Plaintiffs.

### NAMED PLAINTIFFS' FACTS

**A.  Plaintiff Mardis**

67.     Ms. Mardis worked as a tax-preparer for Defendants, through TSA, for 13 years. She worked for Defendants in the Commonwealth of Kentucky in each of those years. During the 2013-2014 and 2014-2015 tax season she worked as a tax preparer at the Jackson Hewitt office located at 1739 West Market Street, Louisville, KY

68.     Like all TSA tax-preparers, Ms. Mardis signed agreements indicating her rate of pay, previously discussed as the Commission Plan and Revised Commission Plan.

69.     In the 2013-2014 tax season, Ms. Mardis received a copy of and signed the Commission Plan. Accordingly, she was to be paid, as a commission, 59% of the net revenues she generated for Jackson Hewitt once those revenues began to exceed her aggregate wage. Exhibit 1.

70.     For the purposes of Ms. Mardis' commissions for the 2013-2014 tax season, net revenues were defined by the Commission Plan as "the total net amount of tax preparation fees received by TSA for all individual tax returns prepared by you through TSA's tax preparation and processing systems during the 2014 Tax Season. By way of example only and without limitation, Your Net Revenues shall be net of (and reduced to reflect)(i) any applicable sales, use, or similar taxes, (ii) any unfunded financial product payments; and [sic] (iv) any tax preparation fees charged to customers in connection with the preparation and processing of fraudulent individual income tax returns."

71.     During the 2013-2014 tax season, Ms. Mardis' sales exceeded her aggregate wage, and she earned commissions.  All total, Ms. Mardis prepared 515 tax returns, which represented $191,480.00 in revenues to Jackson Hewitt.  Exhibit 5, Pricing Return Count M. Mardis.  *See also,* Figure 3:

| Mardis, Wanda | 1040EZ Tier 1 | 27 | 2532.00 | 616.00 | 1916.00 |
|---|---|---|---|---|---|
| | 1040EZ Tier 2 | 6 | 762.00 | 216.00 | 546.00 |
| | 1040EZ Tier 3 | 12 | 1897.00 | 314.00 | 1583.00 |
| | Senior Package 1040A | 14 | 2482.00 | 542.00 | 1940.00 |
| | Senior Package 1040 | 39 | 12164.00 | 2882.00 | 9282.00 |
| | Family Package 1040A | 5 | 1690.00 | 25.00 | 1665.00 |
| | Family Package 1040 | 13 | 5880.00 | 630.00 | 5250.00 |
| | Self-Employed Package | 51 | 19113.00 | 3078.00 | 16035.00 |
| | Standard – 1040EZ | 6 | 1255.00 | 189.00 | 1066.00 |
| | Standard – 1040A | 172 | 65107.00 | 2647.00 | 62460.00 |
| | Standard – 1040 | 170 | 78598.00 | 11926.00 | 66672.00 |
| | **Total for Preparer: Mardis, Wanda** | **515** | **191,480.00** | **23,065.00** | **168,415.00** |

72.     During the 2013-2014 tax season, Ms. Mardis distributed hundreds of gift cards. All totaled, Ms. Mardis' returns were "discounted" by a total of $23,065.00. The great bulk of this represented the Gift Card Promotion.

73.     At the end of the 2013-2014 tax season, Ms. Mardis was paid a portion of her commissions. Unbeknownst to Ms. Mardis, Defendants had deducted the Gift Card Promotion costs from her commissions. Ms. Mardis did not agree to this deduction.

74.     In the 2014-2015 tax season (January-April 2015), Ms. Mardis was presented with a Revised Commission Plan. The Revised Commission Plan's language was changed to read as follows: "[c]ommissions are paid on net received revenue, determined as fees charged separately and received by the Company, less applicable premium fees for sale of TSA's Gold Guarantee program and any promotional programs, *such as the $50 Gift Card program."* (Emphasis added.)

75.     During the 2014-2015 tax season Ms. Mardis exceeded her aggregate wage and again earned commissions.

76.     At the end of the 2014-2015 tax season, Ms. Mardis was paid commissions by Defendant which, again, had been reduced by the cost associated with the gift cards she was forced by Defendants to give to customers pursuant to the Gift Card Promotion.

**B.  Plaintiff Alexander**

77.     Ms. Alexander worked as a tax-preparer for Defendants, through TSA, for 14 years. She worked for Jackson Hewitt in the Commonwealth of Kentucky in each of those years. During the 2013-2014 and 2014-2015 tax season she worked at the Jackson Hewitt office located at 1739 West Market Street, Louisville, KY.

78.     Like all Jackson Hewitt tax-preparers, Ms. Alexander received a copy of and signed an agreement indicating her rate of pay, including the commission payment structure detailed in the Commission Plan.

79.     In the 2013-2014 tax season, Ms. Alexander was to be paid, as a commission, 57%
of the net revenues she generated for Defendants once those revenues began to exceed her
aggregate wage.  All total, Ms. Alexander prepared 486 tax returns, which represented $168,227.00
in revenues to Jackson Hewitt.  Exhibit 6, Pricing Return Count K. Alexander. *See also,* Figure 4:

| 16116 | Alexander, Kimberly | 1040EZ Tier 1 | 45 | 4243.00 | 1320.00 | 2928.00 |
|---|---|---|---|---|---|---|
| | | 1040EZ Tier 2 | 8 | 1513.00 | 0.00 | 1513.00 |
| | | 1040EZ Tier 3 | 20 | 3427.00 | 138.00 | 3289.00 |
| | | Senior Package 1040A | 12 | 2259.00 | 215.00 | 2044.00 |
| | | Senior Package 1040 | 13 | 3862.00 | 825.00 | 3037.00 |
| | | Family Package 1040A | 11 | 3683.00 | 100.00 | 3583.00 |
| | | Family Package 1040 | 4 | 1697.00 | 385.00 | 1312.00 |
| | | Self-Employed Package | 18 | 8324.00 | 2848.00 | 5476.00 |
| | | Dare To Compare | 2 | 825.00 | 545.00 | 280.00 |
| | | Standard – 1040EZ | 8 | 1676.00 | 206.00 | 1470.00 |
| | | Standard – 1040A | 237 | 91270.00 | 5697.00 | 85573.00 |
| | | Standard – 1040 | 108 | 45443.00 | 6610.00 | 38833.00 |
| | | **Total for Preparer Alexander, Kimberly** | **486** | **168,227.00** | **18,889.00** | **149,338.00** |

80.     For the purposes of Ms. Alexander's commissions during the 2013-2014 tax
season, net revenues were defined by the Commission Plan.

81.     During the 2013-2014 tax season, Ms. Alexander's sales exceeded her aggregate
wage, and she earned commissions.

82.     During the 2013-2014 tax season, Ms. Alexander distributed several hundred gift
cards.  All total, Ms. Alexander's returns were "discounted" by a total of $18,889.00, the great
bulk of these deductions representing the Gift Card Promotion.  *Id.*

83.     At the end of the 2013-2014 tax season, Ms. Alexander was paid a portion of her
commissions. Unbeknownst to her, Defendants had deducted the Gift Card Promotion costs from

16

her wages. Ms. Alexander did not agree to this deduction.

84.     In the 2014-2015 tax season, Ms. Alexander was presented with the Revised Commission Plan.

85.     During the 2014-2015 tax season Ms. Alexander exceeded her aggregate wage and again earned commissions.

86.     At the end of the 2014-2015 tax season, Ms. Alexander was paid commissions by Defendant which, again, had been reduced by the the cost associated with the gift cards she was forced by Defendants to give to customers pursuant to the Gift Card Promotion.

**C. Plaintiff Morris**

87.     Ms. Morris was employed by TSA to, during the 2013-2014, 2014-2015, and 2015-2016 tax seasons.

88.     Ms. Morris worked as a tax-preparer for Defendants, through TSA, for 13 years. She worked for Jackson Hewitt in the Commonwealth of Kentucky in each of those years. During the 2013-2014, 2014-2015, and 2015-2016 tax seasons she worked as a tax preparer at the Jackson Hewitt office located at 2218 Hikes Point Lane, Lousville, KY.

89.     Like all Jackson Hewitt tax-preparers, Ms. Morris entered into an agreement indicating her rate of pay. For the 2013-2014 tax season, Ms. Morris was to be paid commissions pursuant to the Commission Plan, and, throughout the 2014-2015, and 2015-2016 tax seasons, she was to be paid commission pursuant to the Revised Commission Plan.

90.     In the 2013-2014 tax season, Ms. Morris' was to be paid, as a commission, 5% of the net revenues from every tax return she prepared for Jackson Hewitt.

91.     During the 2013-2014 tax season, Ms. Morris distributed gift cards pursuant to the Gift Card Promotion.

92.     At the end of the 2013-2014 tax season, Ms. Morris was paid a portion of her

commissions.   Unbeknownst to Ms. Morris, Defendants had deducted the Gift Card Promotion costs from her wages. Ms. Morris did not agree to this deduction.

93.     During the 2014-2015 tax season Ms. Morris again qualified to earn commissions, but was required to participate in the Gift Card Promotion.

94.     At the end of the 2014-2015 tax season, Ms. Morris was paid a portion of her commissions by Defendant, which, again, had deducted from her wages the cost associated with gift cards she was forced to give out pursuant to the Gift Card Promotion.

95.     Ms. Morris is working at Jackson Hewitt once again in the 2015-2016 tax season.

96.     Presently, Ms. Morris is still qualified to earn commissions, but is required to participate in the Gift Card Promotion.   Presumably, the cost of the Promotion will be deducted from her commission check when delivered after this tax season.

**D. Plaintiff Dozier**

97.     Ms. Dozier worked as a tax-preparer for Defendants, through TSA, for 4 years.  She worked for Jackson Hewitt in the Commonwealth of Kentucky in each of those years. During the 2013-2014 and 2014-2015 season she worked as a tax preparer at the Jackson Hewitt office located at 1739 West Market Street, Louisville, KY.

98.     Like all Jackson Hewitt tax-preparers, Ms. Dozier entered into an agreement indicating her rate of pay. For the 2013-2014 tax season, Ms. Dozier was to be paid commissions pursuant to the Commission Plan, and, for the 2014-2015 tax season, she was to be paid commissions pursuant to the Revised Commission Plan.

99.     In the 2013-2014 tax season, Ms. Dozier was to be paid, as a commission, 9% of the net revenues she generated for Defendants once those revenues began to exceed her aggregate wage. All totaled, Ms. Dozier prepared 165 tax returns, which represented $54,611.00 in revenues to Defendants.  Exhibit 7, Pricing Return Count K. Dozier. *See also,* Figure 3:

| | | | | | |
|---|---|---|---|---|---|
| Dozier, Karla | 1040EZ Tier 1 | 16 | 1703.00 | 224.00 | 1479.00 |
| | 1040EZ Tier 2 | 3 | 360.00 | 58.00 | 302.00 |

| | | | | | |
|---|---|---|---|---|---|
| | 1040EZ Tier 3 | 9 | 1443.00 | 20.00 | 1423.00 |
| | Senior Package 1040A | 6 | 986.00 | 100.00 | 886.00 |
| | Senior Package 1040 | 1 | 219.00 | 0.00 | 219.00 |
| | Family Package 1040A | 11 | 3472.00 | 913.00 | 2559.00 |
| | Self-Employed Package | 4 | 1356.00 | 160.00 | 1196.00 |
| | Dare To Compare | 1 | 395.00 | 143.00 | 252.00 |
| | Family Dollar Employee | 1 | 160.00 | 0.00 | 160.00 |
| | Standard – 1040EZ | 4 | 771.00 | 130.00 | 641.00 |
| | Standard – 1040A | 99 | 39289.00 | 2283.00 | 37006.00 |
| | Standard – 1040 | 10 | 4457.00 | 400.00 | 4057.00 |
| | **Total for Preparer: Dozier, Karla** | **165** | **54,611.00** | **4,431.00** | **50,180.00** |

100.    For the purposes of Ms. Dozier's commissions in the 2013-2014 tax season, net revenues were defined by the Commision Plan

101.    During the 2013-2014 tax season, Ms. Dozier's sales exceeded her aggregate wage, and she earned commissions.

102.    During the 2013-2014 tax season, Ms. Dozier distributed over one hundred gift cards.  All total, Ms. Dozier's returns were "discounted" by a total of $4,431.00.  The great bulk of this represented the Gift Card Promotion.

103.    At the end of the 2013-2014 tax season, Ms. Dozier was paid a portion of her

commissions. Unbeknownst to Ms. Dozier, Defendants had deducted the Gift Card Promotion costs from her wages. At that time, Ms. Dozier was never advised of this deduction nor did she agree to it.

104.   In the 2014-2015 tax season, Ms. Dozier was presented with the Revised Commission Plan.

105.   During the 2014-2015 tax season Ms. Dozier exceeded her aggregate wage and again earned commissions.

106.   At the end of the 2014-2015 tax season, Ms. Dozier was paid a portion of her commissions by Defendants. Defendants, again, deducted from her wages the cost associated with the gift cards she was forced by Defendants to give out pursuant to the Gift Card Promotion.

**E.  Plaintiff Baker**

107.   Ms. Baker worked as a tax-preparer for Jackson Hewitt, through TSA, for 9 years. She worked for Jackson Hewitt in the Commonwealth of Kentucky in each of those years. During the 2013-2014 tax season she worked as a tax preparer at the Jackson Hewitt office located at 512 Lyndon Lane, Louisville, KY.

108.   In the 2013-2014 tax season, Ms. Baker's was to be paid, as a commission, a percentage of each tax return she prepared after her sales reached $5,000, pursuant to the Commission Plan.

109.   During the 2013-2014 tax season, Ms. Baker's sales exceeded $5,000, and she earned commissions.

110.   During the 2013-2014 tax season, Ms. Baker distributed roughly 100 gift cards pursuant to the Gift Card Promotion.

111.   At the end of the 2013-2014 tax season, Ms. Baker was paid a portion of her commissions. Unbeknownst to Ms. Baker, Defendants had deducted from her wages the cost

associated with gift cards she was forced to give out pursuant to the Gift Card Promotion. This deduction was not agreed to by Ms. Baker.

**F. Plaintiff Corbitt**

112.    Ms. Corbitt worked as a tax-preparer for Defendants through a private franchisee for 6 years.  She worked for Jackson Hewitt in the state of Illinois in each of those years. During the 2013-2014 tax season, Ms. Corbitt worked as a tax preparer at the Jackson Hewitt office located at 16019 Kedzie Avenue, Markham, IL.

113.    Like all tax preparers for Defendants, Ms. Corbitt entered into an agreement with Defendants which included her rate of pay. For the 2013-2014 tax season, Ms. Corbitt was to be paid 5% of net revenues generated as commission pursuant to the Commission Plan.

114.    In 2013-2014 Defendants ran the Gift Card Promotion at Ms. Corbitt's location where she was required to provide customers who qualified for the Gift Card Promotion with a $50-$100 prepaid gift card.

115.    During the 2013-2014 tax season, Ms. Corbitt distributed an unknown number of gift cards pursuant to the Gift Card Promotion.

116.    At the end of the 2013-2014 tax season, Ms. Corbitt was paid her commissions. Unbeknownst to Ms. Corbitt, Defendants had deducted from her wages the cost associated with gift cards she was forced to give out pursuant to the Gift Card Promotion . This deduction was not agreed to by Ms. Corbitt.

**G. Plaintiff Nichols**

117.    Ms. Nichols has worked for Defendants, through a private franchisee, in the state of Tennessee from 2011 until early April 2016. She was employed at a Jackson Hewitt branch located inside a Wal-mart store in Cookeville, TN.

118.    Like all of Defendants' tax-preparers, Ms. Nichols entered into and signed an

agreement indicating her rate of pay.

119.    For the 2013-2014 tax season, Ms. Nichols' was to be paid a percentage of the net revenues she generated for Defendants once those commissions exceeded her aggregate wage. Exh. 4.

120.    In 2013-2014, Defendants ran the Gift Card Promotion, during which Ms. Nichols was required to provide customers who qualified for the Gift Card Promotion with a $50-$100 prepaid gift card.

121.    During the 2013-2014 tax season, Ms. Nichols' prepared over 100 tax returns and distributed an unknown number of gift cards pursuant to the Gift Card Promotion.

122.    At the end of the 2013-2014 tax season, Ms. Nichols' was paid a portion of her commissions. Unbeknownst to Ms. Nichols, Defendants had deducted from her wages the cost associated with gift cards she was forced to give out pursuant to the Gift Card Promotion. Ms. Nichols did not agree to this deduction.

123.    Ms. Nichols has continued to work for Defendants from 2011 until early April 2016. She has been required to hand out gift cards as part of the Gift Card Promotion every tax season from 2013-2014 until the present.

**COMMON FACTS**

124.    Plaintiffs worked for Defendants as tax-preparers during all or a portion of the 2013-2014, 2014-2015, and/or 2015-2016 tax season.

125.    Plaintiffs either signed agreements indicating their rate of pay or worked without a signed agreement while aware of what they were to be paid.

126.    Plaintiffs were each to be paid a commission which was a percentage of the net revenues that they individually generated for Defendants.

127.     During the 2013-2014, 2014-2015, and/or 2015-2016 tax season, Plaintiffs distributed an unknown number of gift cards (access to such information is in the sole control of Defendants) during the Gift Card Promotion to customers of Defendants.

128.     Plaintiffs had no discretion regarding the employer-specified qualifications customers must possess to qualify for the Gift Card Promotion, nor did Plaintiffs have discretion whether to provide the gift card if a customer qualified for the Gift Card Promotion.

129.     The cost of the Gift Card Promotion was improperly deducted from Plaintiffs' gross revenues prior to Plaintiffs' receipt of payment of their commission percentage, but after their compensation had been earned.

130.     Because the cost of the Gift Card Promotion was deducted after Plaintiffs' had earned their commissions, Plaintiffs were not paid the full amount of commissions to which they were entitled.

131.     The Gift Card Promotion continues to the present and the cost of the Gift Card Promotion continues  to be improperly foisted onto Plaintiffs.

## CLASS ALLEGATIONS

132.     Named Plaintiffs bring this action on behalf of themselves, individually, and as a class action, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class and Sub-classes, subject to expansion or narrowing as appropriate in a motion to certify based on continuing investigation and discovery:

a.  **National Class**:

All persons in the United States who are current and former tax-preparers of JHTSI, Jackson Hewitt and TSA or JHTSI, Jackson Hewitt and Franchisees, from January 2014 through April 15, 2016.

23

b. **State Sub-Classes**:

    i. *Illinois*: All persons in the State of Illinois who are current and former tax-preparers of JHTSI, Jackson Hewitt and TSA or JHTSI, Jackson Hewitt and Franchisees, from January 2014 through April 15, 2016.

    ii. *Kentucky*: All persons in the State of Kentucky who are current and former tax-preparers of JHTSI, Jackson Hewitt and TSA or JHTSI, Jackson Hewitt and Franchisees, from January 2014 through April 15, 2016.

    iii. *Tennessee*: All persons in the State of Tennessee who are current and former tax-preparers of JHTSI, Jackson Hewitt and TSA or JHTSI, Jackson Hewitt and Franchisees, from January 2014 through April 15, 2016.

133. Excluded from the Classes are: (a) any judge or magistrate presiding over this action and members of their families; (b) any Defendant and/or Third-Party Defendant and any entity in which any Defendant and/or Third-Party Defendant have a controlling interest or which has a controlling interest in any Defendant and/or Third-Party Defendant and its legal representatives, assigns and successors of any Defendant and/or Third-Party Defendant; and (c) all persons who properly execute and file a timely request for exclusion.

134. ***Numerosity***. On information and belief, there are tens of thousands of individuals who Defendants employed as tax preparers during the 2013-2014, 2014-2015, and 2015-2016 tax seasons. Defendants maintain many locations employing tax preparers in each state for which a subclass has been brought. Although the exact number of such persons is unknown at this time, Defendants' record systems contain information on the identities and location of all such parties. Because Defendant has exclusive control of such information, Plaintiffs reserve their right to amend their allegations following completion of relevant discovery from Defendant. Given the

nature and extent of Defendants' activities in the 50 states where they employee individuals sought to be represented in this lawsuit, in each of which the Promotion was run during the relevant class period, the members of the Class, and the Sub-Classes, are so numerous that joinder of all members is impracticable.

135.    *Commonality*.  Plaintiffs' claims involve questions of law and fact common to the Class and the Sub-Classes, because Plaintiffs and other members of the Classes were parties to commission agreements that had indentical relevant terms.  Among these common questions of law or fact are:

      a.    Whether Jackson Hewitt controlled the operations of TSA and its Franchisees enough to be deemed a joint employer of the TSA and Franchisee employees;

      b.    Whether the Defendants deducted the cost of the Promotion from the wages of the Classes;

      c.    Whether Defendants participated in the plan, scheme and course of conduct complained of herein;

      d.    Whether deducting the cost of a promotion from employee commissions violates the state wage and hour laws of Sub-Classes;

      e.    Whether deducting the cost of the promotion for employee commissions is a breach of the contract entered between the employees and Defendants;

      f.    Whether deducting the cost of the promotion for employee commissions constitutes unjust enrichment by the Defendants;

      g.    Whether the members of the Class and Sub-Classes have sustained damages, and, if so, what is the proper measure thereof.

136.    *Typicality*. Named Plaintiffs' claims are typical of the claims of the members of the

Class and Sub-Classes, inter alia, because the Named Plaintiffs entered into wage agreements with Defendants in each state.

137.   *Adequacy*.  Named Plaintiffs will fairly and adequately protect the interests of the Class and their respective Sub-Classes.  Named Plaintiffs have retained competent counsel, experienced in class litigation, and have no conflict of interest with other Class or Sub-Class members in the maintenance of this class action.  In addition, Named Plaintiffs have no relationship with Defendants except as employees and former employees.  Named Plaintiffs' interests are antagonistic to the interests of Defendants and Named Plaintiffs will vigorously pursue the claims of the Class and Sub-Classes.

138.   *Declaratory or Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).* Alternatively or additionally, Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

139.   *Predominance and Superiority: Federal Rule of Civil Procedure 23(b)(3).* Alternatively or additionally, there are common questions of law or fact common to Class and Sub-Class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because:

      a.   The damages suffered by each individual class member may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class and Sub-Classes to individually seek damages;

      b.   Named Plaintiffs are unaware of any litigation currently undertaken by any current or former employees to adjudicate this dispute;

c. Class and Sub-Class members, to the extent that they are aware of their rights against Defendants herein, would be unable to secure counsel to litigate their claims on an individual basis because of the relatively small nature of the individual damages, the lack of financial resources of many members of the Class and Sub-Classes, and the fear of retaliation for filing suit, so that a class action is the only feasible means of recovery for the Class and Sub-Class members; and,

Named Plaintiffs envision no difficulty in the management of this action as a class action, nor will there be any difficulty in the management of the various sub-classes. Damages may be calculated with mathematical precision from the information maintained in Defendants' records, so that the cost of administering any recovery can be minimized. Defendants' records will also reveal the name and location of all employees employed with Defendants, which will make notifying all Class and Sub-Class members simple and straight forward.

## COUNT I

## BREACH OF CONTRACT

### (On Behalf of Plaintiffs Against Tax Services of America or Unknown Franchisees)

140. Plaintiffs reallege and incorporate by reference all of the preceeding allegations as if fully set forth herein.

141. This Count for common law breach of contract is brought by all Plaintiffs on behalf of the Nationwide Class against TSA or Unknown Franchisees.

142. Plaintiffs employed by franchises owned by TSA entered into substantially identical 2013-2014 Commission Plans that constituted binding written contracts which set the sales commissions due as a percentage of the net revenues that the tax preparer generated for Defendants.

143.    Plaintiffs employed by franchises owned by Unknown Franchisees during the 2013-2014, 2014-2015, and 2015-2016 tax seasons entered into written contracts with the Unknown Franchisees governing their commission payments that constituted binding written contracts.

144.    The conduct alleged herein, where Defendants improperly and illegally deducted the costs of the Gift Card Promotion from Plaintiffs', is a significant and material breach of the commission plans.

145.    Plaintiffs gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their contracts with TSA or Unknown Franchisees.

146.    As a direct and proximate result of TSA's or Unknown Franchisees' breach of the contract, Plaintiffs suffered damages in the form of lost commission payments.

147.    Plaintiffs and members of the Class are entitled to legal and equitable relief against TSA or Unknown Franchisees' (depending on which employed them), including, but not limited to, damages, incidental and consequential damages, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT II

### UNJUST ENRICHMENT
### (On Behalf of all Plaintiffs against JHTSI and Jackson Hewitt)

148.    Plaintiffs reallege and incorporate by reference all of the preceeding allegations as if fully set forth herein.

149.    JHTSI and Jackson Hewitt have benefited and been enriched by the improper and unlawful conduct alleged herein.  JHTSI and Jackson Hewitt have generated and received for themselves millions of dollars of revenue as a result of the Gift Card Promotion, while Plaintiffs

have unfairly paid the price for the cost of the Gift Card Promotions.

150.    JHTSI and Jackson Hewitt have knowledge of this benefit.

151.    JHTSI and Jackson Hewitt have voluntarily accepted and retained this benefit.

152.    The circumstances, as described herein, are such that it would be inequitable for JHTSI and Jackson Hewitt to retain the ill-gotten benefit without paying the value thereof to Plaintiffs.

153.    Plaintiffs are entitled to the amount of JHTSI's and Jackson Hewitt's ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## COUNT III

**VIOLATION OF KENTUCKY REVISED STATUTES § 337, *et seq.***

**(On Behalf of Plaintiffs Mardis, Alexander, Morris, Dozier, and Baker, individually and on behalf of the Kentucky Sub-Class Against All Defendants)**

154.    Plaintiffs reallege and incorporate by reference all of the preceeding allegations as if fully set forth herein.

155.    This Count for violation of Kentucky Revised Statutes § 337, *et seq* is brought by Plaintiffs Mardis, Alexander, Morris, Dozier, and Baker on behalf of the Kentucky Sub-Class.

156.    Plaintiffs Mardis, Alexander, Morris, Dozier, Baker, and members of the Kentucky Sub-Class, were, or are, employees of Defendants as that term is defined in KRS § 337.010(1)(e).

157.    Defendants are "employers" as that term is defined in KRS § 337(1)(d).

158.    Plaintiffs Mardis, Alexander, Morris, Dozier, Baker, and members of the Kentucky Class were paid wages as that term is defined in KRS § 337.010(1)(c)(1) during the relevant period.

159.    Defendants illegally withheld wages from Plaintiffs Mardis, Alexander, Morris,

Dozier, Baker, and members of the Kentucky Sub-Class, in violation KRS § 337.060(1) by deducting the cost of the Gift Card Promotion from Plaintiffs' commissions.

160.    Defendants failed to provide the Plaintiffs Mardis, Alexander, Morris, Dozier, Baker, and members of the Kentucky Sub-Class with a statement of deductions from their wages in violation KRS § 337.070(1).

## COUNT IV

## VIOLATION OF ILLINOIS WAGE PAYMENT AND COLLECTION ACT

### (On Behalf of Plaintiff Corbitt, individually, and on behalf of the Illinois Sub-Class Against All Defendants)

161.    Plaintiffs reallege and incorporate by reference all of the preceeding allegations as if fully set forth herein.

162.    Ms. Corbitt and the Illinois Sub-Class were, or are, employees of Defendants as that term is defined in 820 ILCS § 115/2.

163.    Defendants are "employer(s)" as that term is defined in 820 ILCS § 115/2.

164.    The commissions paid to Ms. Corbitt and the Illinois Sub-Class constitute "wages" as that term is defined in 820 ILCS § 115/2.

165.    Defendants failed to pay Ms. Corbitt and the Illinois Sub-Class all of their earned wages in violation of 820 ILCS § 115/4.

166.    Defendants illegally withheld or deducted the cost of the Gift Card Promotion from Ms. Corbitt and the Illinois Sub-Class in violation of 820 ILCS § 115/9.

## COUNT V

## VIOLATION OF TENNESSEE WAGE AND HOUR LAW

### (On Behalf of Plaintiff Nichols, individually, and on behalf of the Tennessee Sub-Class Against All Defendants)

167.    Plaintiffs reallege and incorporate by reference all of the preceeding allegations as if fully set forth herein.

168.    Defendants are "employer(s)" as that term is used in Tenn. Code. Ann. § 50-2-101-113.

169.    The commissions earned by Ms. Nichols and the Tennessee Sub-Class constitute "wages" as that term is defined in Tenn. Code Ann. § 50-2-110(c)(2).

170.    Defendants failed to pay Ms. Nichols and the Tennessee Sub-Class all of their earned wages in violation of Tenn. Code Ann. §§ 50-2-101-113.

171.    Defendants illegally withheld or deducted the cost of the Gift Card Promotion from Ms. Nichols and the Tennessee Sub-Class in violation of Tenn. Code § 50-2-110.

## PRAYER FOR RELIEF

172.    Wherefore, Plaintiffs pray that this Court:

a.   Certify the classes as requested herein;

b.   Appoint the Named Plaintiffs as Class Representatives;

c.   Appoint counsel herein as Lead Counsel representing the classes;

d.   Award all damages caused by Defendants including punitive damages where appropriate;

e.   Award prejudgment interest as is appropriate running from the date these wages were first due;

f.   Award attorneys fees and costs; and

g.   Grant any such further relief as this Court may deem appropriate.

*/s/Philip D. Stern*        Dated: April 15, 2016
Philip D. Stern
STERN THOMASSON LLP
150 Morris Avenue, 2nd Floor
Springfield, NJ  07081-1329
(973)379-7500


*/s/Andrew T. Thomasson*  Dated: April 15, 2016
Andrew T. Thomasson
STERN THOMASSON LLP
150 Morris Avenue, 2nd Floor
Springfield, NJ  07081-1329
(973)379-7500


*Counsel for Plaintiffs*

### Notice of Admission *Pro Hac Vice* Expected to be sought

Gary E. Mason
WHITFIELD BRYSON & MASON LLP
1625 Massachusettes Ave. NW Ste. 605
Washington, D.C. 20036
(202) 640-1160

John C. Whitfield
Caroline Taylor
WHITFIELD BRYSON & MASON LLP
1205 4th Avenue North
Nashville, TN 37208
(615) 921-6500

Co-Lead Counsel for Plaintiffs
*Pro Hac Vices to be sought*

Robert W. "Joe" Bishop
John S. Friend
Tyler Z. Korus
BISHOP KORUS FRIEND
6520 Glenridge Park Place, Suite 6
Louisville, KY  40222
(502)425-2600

Co-Lead Counsel for Plaintiffs
*Pro Hac Vices to be sought*

### CERTIFICATION PURSUANT TO LOCAL CIVIL RULE

Pursuant to L. Civ. R. 11.2, I hereby certify to the best of my knowledge that the matter in controversy is not the subject of any other action pending in any court or the subject of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated. I further certify that I know of no party, other than putative class members, who should be joined in the action at this time.

*/s/Philip D. Stern*
Dated: April 15, 2016        Philip D. Stern